# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

LISA VIZCARRA, individually, and on
behalf of those similarly situated,

               Plaintiff,

v.

UNILEVER UNITED STATES, INC.,

               Defendant.

Case No. 4:20-cv-2777-YGR

---

## REPLY EXPERT REPORT OF DR. J. MICHAEL DENNIS

### JUNE 16, 2022

---

MAY REFERENCE MATERIAL DESIGNATED "CONFIDENTIAL" OR
"CONFIDENTIAL – ATTORNEYS' EYES ONLY" UNDER PROTECTIVE
ORDER

I, J. Michael Dennis, Ph.D., under penalty of perjury, hereby declare as follows:

1.      I have been retained by counsel for the Plaintiff in this matter. If called upon to testify, I would and could testify competently to all such subject matter in this expert report.

2.      I previously wrote two expert reports (dated June 11, 2021 and February 18, 2022) in connection with this litigation.

3.      Since it has been a year since I previously documented my expert credentials for the court, I provide below an updated description of my qualifications. My current curriculum vitae is attached as Attachment A, including a list of my expert testimony in the past four years.

4.      Plaintiff's counsel asked to reply to the criticisms of Defendant's expert, Dr. Olivier Toubia, who authored an expert rebuttal report dated May 18, 2022 ("Toubia Report"). I do so below.

5.      Dr. Toubia attempts to rebut my revised consumer perceptions survey, my materiality survey, and my proposed price premium survey, all of which I discussed in my February 18, 2022 revised expert report.

6.      Plaintiff's counsel has retained my services at the hourly rate of $475. My compensation is not contingent on the results of my work or any outcome of the litigation. My expert opinions expressed in this report are solely my own.

## **BACKGROUND**

7.      In my February 8, 2022 revised expert report ("Revised Dennis Report") (which Dr. Toubia is attempting to criticize), I provided information about consumers' perceptions of the Vanilla Representations. I revised my consumer survey to test only the Vanilla Representations on the Product's front label, instead of the entire product packaging. Revised Dennis Report, ¶¶ 25-32. My consumer perceptions survey found that 8 out of 10 consumers perceived the front label with the Vanilla Representations (with no other representations present) to communicate that all of the vanilla flavor comes from vanilla extract (made from the vanilla plant). *Id.*, ¶ 44. I concluded from my consumer survey that a

reasonable consumer in the state of California perceives the Vanilla Representations to convey that all the vanilla flavor comes from vanilla extract (made from the vanilla plant). *Id.*, ¶ 53.

8.   I also presented information in my February 8, 2022 revised expert report with respect to the potential materiality of the Vanilla Representations. *Id.*, ¶¶ 33-34. My survey found that almost 9 out of 10 consumers (88.8%) indicated that they would prefer to purchase the Product having the Vanilla Representations, while only 11.2% reported that they would prefer to purchase the Product not having the Vanilla Representations on the front label of the packaging. *Id.*, ¶ 47. As a result, I concluded from my consumer survey that the Vanilla Representations are material to purchase decision-making for a reasonable consumer in the state of California. *Id.*, ¶ 54.

9.   My revised expert report also presented a modified proposal for conducting a price premium survey. I modified the proposed research approach in order to isolate the impact of the Vanilla Representations. *Id.*, ¶¶ 58-59. My proposed approach will be able to measure the price premium attributable to the Vanilla Representations, if any, through a series of trade-off questions such that I will be able to measure the discounted price at which consumers could be induced to purchase the product without the Vanilla Representations when the product with the Vanilla Representations is also available for sale. *Id.*, ¶¶ 50-67.

## QUALIFICATIONS

10.   I have been personally involved in the design and conduct of hundreds of statistical surveys using the internet and telephone modes of data collection over the last 25 years.

11.   Designing and conducting surveys about the opinions, perceptions, attitudes, preferences, and values of consumers, voters, members of associations, and citizens is a service that I have provided for my customers for more than 20 years.

12.   Since joining the National Opinion Research Center ("NORC") in December 2014, I have been a Senior Vice President leading the online panel

survey research business for NORC. Affiliated with the University of Chicago, NORC has conducted research for Federal, foundation, and academic clients for 80 years, and is responsible for some of the most prestigious survey projects in the U.S, including the General Social Survey and the Survey of Consumer Finance.

13.     For 2012-2013, I was a Managing Director at GfK (which acquired my employer Knowledge Networks in 2012). GfK at the time was the fifth largest market research firm worldwide, offering research services in 90 countries. I have worked as a survey research expert for more than 20 years, authoring more than 60 articles, conference and seminar papers, or book chapters. I am a frequent speaker at the annual meetings of the American Association for Public Opinion Research ("AAPOR") and the American Statistical Association. Given my expertise in online surveys, I was appointed to be a member of the AAPOR Task Force on Online Panels that published recommendations for researchers regarding online surveys.

14.     During the period 2000 to 2013, I managed all the online panel research conducted by Knowledge Networks (acquired by GfK in January 2012) on behalf of federally funded principal investigators who conduct health, economic, social, and political research. When I began at Knowledge Networks as the Vice President of Operations and Survey Research in 2000, I was responsible for leading survey research for the company and for developing the probability-based KnowledgePanel, which was the core company asset for Knowledge Networks. As part of the start-up of Knowledge Networks, I also designed and implemented approximately 20 internally funded surveys in the areas of health, finance, public policy, and consumer research, and oversaw the scientific direction and operational management of the construction of KnowledgePanel.

15.     In 2001, I founded the client-facing business unit "Government & Academic Research" for Knowledge Networks. In the role of Managing Director, I grew the department from a two-person department to a staff of more than 50 researchers. I advised clients on the design of all phases of their survey research projects, including sample design, questionnaire design, quality control procedures, and data analysis.

16.     The research I conducted at Knowledge Networks, GfK, and NORC has had to meet the high-quality standards maintained by federal sponsors of statistical surveys funded by agencies such as the U.S. Centers for Disease Control and Prevention, the Environmental Protection Agency, and the National Science Foundation. I have been the principal investigator for studies funded by the U.S. National Science Foundation. My opinions have been quoted in The Wall Street Journal, The New York Times, Crain's Chicago Business, and Business Week.

17.     Before joining Knowledge Networks, I was a Senior Scientist at Abt Associates, where I managed the data collection for the largest random digit dialing telephone survey in the United States, the National Immunization Survey, which was funded by the U.S. Centers for Disease Control and Prevention with management support from the National Center for Health Statistics. I also led other survey studies funded by the National Institute on Alcohol Abuse and Alcoholism, the National Cancer Institute, the Social Security Administration, and the White House Office of National Drug Control Policy.

18.     Most recently, I have been NORC's Director for two significant studies regarding the 2020 general elections in the U.S. First, I was and am still the NORC Director for the 2020 Facebook Election Research Project, which continues with post-election analyses. While funded by Facebook, the study is being directed by 15 university-based academics. I am directing all aspects of sampling and survey data collection for five-waves of data collection in a longitudinal study of approximately 300,000 U.S. adults, with surveys conducted both before and after the November 2020 general elections. The study will provide statistical evidence of the extent to which, if any, that social media has an impact on our U.S. politics, democratic institutions, and elections.

19.     Second, I am also the NORC Director for the America in One Room (A1R) projects in 2019 and the 2022 climate change study in preparation for the recent Glasgow Summit on Climate Change. Funded by Helena Project and conducted under the supervision of Professors James Fishkin and Larry Diamond from the Center for Deliberative Democracy at Stanford University, I have and am still currently directing the deliberative polls. The 2019 deliberative polls were chronicled in a special pull-out section of The New York Times on October 2,

4

2019 (Sunday edition).[1] I was interviewed by CNN, The New York Times, other media outlets, and the film documentary director.

20.     In the 2020-2021 time frame, my research focus has been in directing more than twenty survey studies related to Covid-19 for the U.S. Centers for Disease Control and Prevention, AARP, Boston University, and other organizations. I also led NORC's initiative to create a partnership agreement with AARP, resulting in the June 2021 launch of Foresight 50+ research solutions.[2]

21.     I also have extensive experience as a survey expert in the litigation context, including conducting more than twenty consumer surveys. I have testified on more than fifty occasions as an expert witness since 2002, including at deposition or trial.

22.     I have designed and conducted consumer surveys using various methodologies that have been accepted by courts in the following cases:

- *Price [Miles] v. Philip Morris*, Case No. 00 L 0112 (Circuit Court, Third Judicial Court, Madison County, Illinois)
- *Zill v. Sprint*, Case No. RG03114147 (Superior Court of the State of California, County of Alameda) (collectively the "cellphone unlocking cases")
- *Ebin v. Kangadis Food Inc.*, Case No. 1:13-cv-02311 (S.D.N.Y.)
- *Sachs and Alden v. Toyota Motor Corporation*, Case No. BC443701 (Superior Court of the State of California, County of Los Angeles)
- *Avram v. Samsung Electronics America, Inc. and Lowe's Home Centers*, Case No. 2:11-cv-6973 (KM)(SCM) (D.N.J.)
- *Geanacopoulos v. Philip Morris, USA*, Civil Action No. 98-6002-BLSI (Superior Court for the Commonwealth of Massachusetts)
- *Scotts EZ Seed Litigation*, Case No. 12-CV-4727 (VB)(PED) (S.D.N.Y.)
- *Dzielak v Whirlpool*, Case No. 12-cv-00090 (D.N.J.)
- *Pettit v. Procter & Gamble [RE: Flushable Wipes]*, Case No. 3:15-CV-02150-RS (N.D. Cal.)

---

[1] *See* https://en.wikipedia.org/wiki/America_in_One_Room. Badger, Emily; Quealy, Kevin. "These 526 Voters Represent All of America. And They Spent a Weekend Together". The New York Times. Retrieved 2 October 2019. President Obama recommended The New York Times article in a tweet.

[2] https://www.norc.org/Research/Capabilities/Pages/Foresight50.aspx.

- *Fitzhenry-Russell, et al. v. Dr. Pepper Snapple Group, Inc., et al.*, Case Nos. 5:17-cv-00564-NC (lead); 5:17-02341-NC (consolidated) (N.D. Cal.)
- *Theodore Broomfield, et al. v. Craft Brew Alliance, Inc., et al.,* Case No. 5:17-cv-01027-BLF (N.D. Cal, San Jose Div.)
- *Benson v. Newell Brands, Inc.*, Case No. 19-cv-06836 (N.D. Ill).
- *Sharpe v. A & W Concentrate*, Civil Action No. 19-cv-00768 (BMC) (E.D.N.Y.)
- *Fishon et al. v. Premier Nutrition Corp.*, Case No. 3:16-CV-06980 RS (N.D. Cal, San Francisco Div.)

16.     Specifically, I have designed and conducted consumer perception surveys in *Price v. Philip Morris; Zill v. Sprint; Otto v. Abbott Laboratories; Ebin v. Kangadis; Scotts EZ Seed Litigation; Pettit v. Procter & Gamble [RE: Flushable Wipes]; Theodore Broomfield, et al. v. Craft Brew Alliance, Inc.; Yamagata et al. v. Reckitt Benckiser LLC*, *Benson v. Newell Brands, Inc.*, *Sharpe v. A & W Concentrate*, and *Fishon v. Premier Nutrition Corp.*

## MY CONSUMER SURVEYS IN *VIZCARRA* FOLLOW DESIGN PRINCIPLES CONSISTENT WITH MY PAST LITIGATION SURVEYS

17.     As a foundational matter with respect to Dr. Toubia's challenges, I am a court-qualified research expert in consumer surveys and analysis. I have designed, conducted, and reported on consumer surveys in the context of various class-action litigations on multiple occasions, including but not limited to the following: *Sharpe v. A&W Concentrate Co.*, No. 19-CV-768 (BMC), 2021 WL 3721392 (E.D.N.Y. July 23, 2021); *McMorrow v. Mondelez Int'l, Inc.*, No. 17-CV-2327-BAS-JLB, 2021 WL 859137 (S.D. Cal. Mar. 8, 2021); *Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, 326 F.R.D. 592 (N.D. Cal. 2018); *de Lacour v. Colgate-Palmolive Co.*, 338 F.R.D. 324 (S.D.N.Y. 2021); *Bowling v. Johnson & Johnson*, No. 17-CV-3982 (AJN), 2019 WL 1760162 (S.D.N.Y. Apr. 22, 2019); *Gregorio. v The Clorox Company*, No. 4:17-cv-03824-PJH. (N.D. Cal.); *Cabrera v. Bayer Healthcare LLC.*, No. LA CV17-08525 JAK (JPRx) (C.D. Cal.); *Willis v. Colgate-Palmolive Co.*, No. 2:19-CV-08542-JGB-RAO (C.D. Cal.); *Benson v. Newell Brands, Inc.*, No. 19-cv-06836 (N.D. Ill.); *Broomfield v. Craft Brew*

*Alliance, Inc.*, No. 5:17-cv-01027-BLF (N.D. Cal.); *Maeda v. Kennedy Endeavors, Inc.*, No. 1:18-CV-00459-JAO-WRP (Hawaii). As I did in each of those matters, the consumer surveys I conducted in *Vizcarra* were designed in accordance with industry standards and based on my decades of experience and expertise.

18.     Whenever I design and conduct a consumer survey, including in this case, I take great care to ensure that I follow sound research practices and industry standards by considering publications and technical materials generally accepted by the survey research community.[3]

19.     When I have offered expert opinions in other matters that are also based on these industry standards, experts retained by the defendants predictably provide rebuttal expert opinions that mirror what Dr. Toubia offers here, such as complaints that my survey does not use an experimental design with test and control groups (Toubia Report, ¶ 28), for using an "unrealistic stimulus" that is "fundamentally different from what consumers encounter in the marketplace" (Toubia Report, ¶ 31), for using closed-ended survey questions instead of open-ended survey questions (Toubia Report, ¶ 33), for purportedly having "ambiguous answer options (Toubia Report, ¶ 34), and for purportedly bringing an "artificial focus" and creating a "focalism bias" that "biases the survey responses" (Toubia Report, ¶ 42).

20.     As I have explained in those contexts, and explain again here, my consumer surveys do not have the flaws alleged by defendants' experts typically, and by Dr. Toubia here. My surveys prepared in the context of litigation follow industry-standard practices in using closed-ended survey questions, for presenting questions that effectively disguise the research objectives to prevent "demand effects" and "focalism bias," and to assure that I have selected the relevant consumers for the survey. My responses to Dr. Toubia's criticisms below are essentially the same to what I have had to say in response to defendants' experts in

---

[3] Among other treatises, I consider the survey research textbook by Robert Groves et al., <u>Survey Methodology</u> (Second Edition); on Peter Marsden and James Wright in the <u>Handbook of Survey Research</u> (Second Edition); on Norman Bradburn et al. in <u>Asking Questions</u>; on Roger Tourangeau et al. in <u>The Psychology of Survey Response</u>; and on Howard Schuman and Stanley Presser in <u>Questions and Answers in Attitude Surveys</u>.

other matters, including but not limited to *Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, *de Lacour v. Colgate-Palmolive Co.*, *Maeda v. Kennedy Endeavors, Inc.*, *Benson v. Newell Brands, Inc.*, and *In Re: Rock 'N Play Sleeper, Marketing, Sales Practices, and Products Liability Litigation.*

21.     For instance, Dr. Toubia complains that my survey stimulus (the image of the front label of the Product displaying only the Vanilla Representations) is "unrealistic" and "actually creates an additional bias by removing brand" (Toubia Report, ¶ 30). Dr. Toubia's complaint is not internally consistent because he in fact recognizes the importance of controlling for pre-existing beliefs (Toubia Report, ¶ 22). I deliberately removed the Breyers branding elements to prevent consumers from relying on their brand loyalty and pre-conceptions about the Breyers products in answering the survey questions. In arguing that I should not have presented an unbranded product image to the stimulus, Dr. Toubia is implausibly arguing *against* the design imperative to take steps to reduce respondents' reliance on irrelevant information, such as pre-existing familiarity with the Product, in answering the survey questions.[4]

22.     Furthermore, Dr. Toubia misinterprets my revised expert report (Toubia Report, ¶ 30). I did not state that removing the Breyers branding elements from the stimulus would eliminate the impact of *all possible* pre-existing beliefs related to my stimulus (such as opinions about the role of vanilla beans in making vanilla extract). Instead, I explained that the basis for removing the branding elements was to prevent respondents from relying on their previously formed opinions about the Product itself.[5]

---

[4] Elsewhere, Dr. Toubia argues in favor of controlling for the existence of respondents' pre-existing beliefs in arguing for the use of an experimental, test-control design. *See*, *e.g.*, Toubia Report, ¶ 26 (arguing that a control group would "account for additional factors such as noise and preexisting beliefs unduly impacting respondents' answers").

[5] I stated the following in my revised report: "To isolate any impact associated with the Vanilla Representations on the perceptions of consumers, it is appropriate to remove the Breyers branding because otherwise consumers may rely on previously formed opinions about the extent to which the Breyers Natural Vanilla products are made with vanilla extract (from the vanilla plant)" (Revised Dennis Report, ¶ 28).

23.     I have often used this technique in my court-approved surveys in order to neutralize consumers' brand loyalties, making possible the isolation of consumers' perceptions of the challenged claim(s). As mentioned, I deliberately removed the Breyers branding elements so that a direct measurement of consumer perceptions of the Vanilla Representations will not be influenced by irrelevant considerations, such as consumers' preconceptions of the Breyers brand or by loyalty to the Breyers brand. I employed this technique in *Ebin v. Kangadis*, No. 1:13-cv-02311, (S.D.N.Y), in *RE: Scotts EZ Seed*, No. 12-CV-4727 (VB) (PED), (S.D.N.Y.), in *Bowling v. Johnson & Johnson*, No. 1:17-cv-03982 (S.D.N.Y), and in *Benson v. Newell Brands, Inc.*, No. 19-cv-06836, (N.D. Ill.), among others.

24.     As an example, below is a (i) question from my consumer perception survey that I used in *Benson v. Newell Brands, Inc*, 2021 WL 5321510 at * 6 (N.D. Ill. Nov. 16, 2021), which the court in that case accepted for purposes of granting class certification. In the consumer survey for that case, I deliberately removed the NUK brand name and branding elements, and (ii) a question from my survey in the *Vizcarra* litigation that similarly removes the Breyers brand name and key branding elements. In both surveys, I asked respondents directly for their perceptions of the product packaging using a closed-ended survey question. By removing the NUK branding elements from the product packaging, I assured that my respondents would respond to my consumer survey question without reliance on pre-existing beliefs and loyalties regarding the NUK brand.

**Question in Dennis Survey in *Benson***          **Question in Dennis Survey in V*izcarra***



25.     Dr. Toubia also complains that my survey "relies on an inadequate closed-ended question" rather than using the open-ended survey format (Toubia Report, ¶ 17, 33). Dr. Toubia also complains that I offer "no acknowledgement of the potential weaknesses of closed-ended questions," use of which he warns (by citing Professor Diamond) can lead to respondents being "forced to choose one [response] option that does not express his or her opinion" (Toubia Report, ¶ 33). I show above an example of a closed-ended survey question in the comparison of my consumer perception questions used in *Benson* and in *Vizcarra*.

26.     Dr. Toubia's concerns about closed-ended questions are common among defendants' experts who understand that open-ended questions are cognitively challenging for respondents to answer and therefore result in higher nonresponse, less complete responses, and, consequently, lower estimates of consumers' opinions and attitudes on market research topics. For quantitative surveys like the ones I conducted in *Vizcarra* (not qualitative research), the use of closed-ended survey questions (not open-ended questions) is a more generally

acceptable question format in the survey research industry, as explained by me in my revised expert report.[6]

27.     In addition, I have consistently used the closed-ended question format in my consumer perceptions surveys prepared in the context of litigation, including but not limited to the following cases: *Miles v. Philip Morris*, *Zill v. Sprint*, *Kangadis v. Ebin*, *Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, *Bowling v. Johnson & Johnson*, *Cabrera v. Bayer Healthcare LLC.*, *Willis v. Colgate-Palmolive Co.*, *Broomfield v. Craft Brew Alliance, Inc.*, *Sharpe v. A&W Concentrate Co.*, *Benson v. Newell Brands, Inc.*, *Fishon v. Premier Nutritionals*, and *Maeda v. Kennedy Endeavors, Inc.* I have used the closed-ended question format in these and other cases to provide courts reliable information about consumers' perceptions of challenged claims.

28.     Dr. Toubia specifically calls out a problematic instance of a closed-ended survey question, that is, when the provided list of response options is not exhaustive or complete (Toubia Report, ¶ 33). A brief examination of my closed-ended survey question, shown above, reveals that the list of response options is in fact exhaustive and complete. I provided the respondents a binary choice that covers all possibilities about the property that my survey is measuring either *all of the vanilla flavor* or *not all of the vanilla flavor* is expected to come from vanilla extract. The response list is complete.

29.     Moreover, my survey does not "force" respondents to make a selection of one of the two substantive response options – I provided a "Not sure" option to provide the respondents an appropriate option if they cannot make up their minds or do not have an opinion.

30.     Dr. Toubia also complains that the materiality part of my consumer survey, which uses the referendum question format, suffered from the purported flaw of "focalism bias" that "inflates the importance of the attributes that differ between the two alternatives beyond the role they would play in a real-world purchase" (Toubia Report, ¶ 42). Like other experts retained by defendants, Dr. Toubia argues that the referendum format creates "demand artifacts" (Toubia

---

[6] Bradburn, N. M., Sudman, S., & Wansink, B. 2004. *Asking Questions: A Practical Guide to Questionnaire Design*, p. 167.

Report, ¶ 44). By this term, Dr. Toubia is referring to the potential bias that could occur if a survey primes respondents to answer the questions in ways that the respondent expects the researcher wants them to answer, or put simply, respondents trying to please the researcher with their answers (Toubia Report, n. 69).

31.     As a foundational matter, the argument that my survey suffers from demand effects is *prima facie* implausible because the respondents are taking the survey online (not administered by an interviewer) – that is, there is no possible mechanism by which a respondent can plausibly feel any warmth or feelings of camaraderie by supposedly pleasing a researcher with their answers.

32.     Moreover, the research purposes, sponsor, and identity of the researcher are blind to the respondents; respondents have no possible targets in mind for pleasing others with their answers.

33.     Finally, even a brief examination of my materiality survey will show that I provide no visual clues or other emphases for either of the two products that could potentially communicate that I, the researcher, favor a selection of one of the two products. Just like casting a vote at an election, there are options in my referendum for the respondent to consider for selection – or not vote at all. When an actual ballot in an election identifies one candidate a Democrat and another one as a Republican, there are no accusations of unfairness, priming, or creation of demand artifacts. It is simply information to help voters (or in my case, respondents) state a preference for one of the options or answer "Don't Know."

34.     I have frequently used the referendum survey question format in litigation surveys when my assignment involves the measurement of any materiality attributable to the challenged claim. The referendum question format is not experimental or an innovative survey technique. The question format has been one of my core survey question formats dating back to my 2014 consumer survey in *Ebin v. Kangadis*. I have used the referendum survey question format in consumer surveys accepted by courts for purposes of class certification, including in: *Kangadis v. Ebin*, *Sharpe v. A&W Concentrate Co.*, *Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, *Bowling v. Johnson & Johnson*, *Broomfield v. Craft*

*Brew Alliance, Inc.*, *Benson v. Newell Brands, Inc.*, and *Maeda v. Kennedy Endeavors, Inc.*

35.     To illustrate that my approach in *Vizcarra* is consistent with my past use of the referendum question, below is a side-by-side comparison of the referendum question in my survey conducted in *Benson v. Newell Brands, Inc.* and in *Vizcarra*. In both referenda, respondents are presented a clear choice between two products that differ only with respect to the presence or absence of the challenged representations, while also presented the "Don't Know" option.

### Referendum in Dennis Survey in *Benson*

Please select the PACIFIER Product you would purchase.

|  | Product A | Product B |
|---|---|---|
| Brand | Same Nationally Known BRAND | Same Nationally Known BRAND |
| Packaging | Same | Same |
| Product Size | Same | Same |
| Label Claim | ORTHODONTIC PACIFIER | |
| Price, not including tax | Same | Same |
| Select one you would purchase | ○ | ○ |
| | Don't Know ○ | |

### Referendum in *Vizcarra*

If these were your only two options, which of these two ICE CREAM products would you purchase?
Click on Product Package image to enlarge.

| Product Features | ICE CREAM A | ICE CREAM B |
|---|---|---|
| Product Package |  |  |
| Product Descriptor | Vanilla | Natural Vanilla |
| Price | Same | Same |
| Amount of Ice Cream | 1.5 Quarts | 1.5 Quarts |
| Availability at the same Frozen Temperature at Store | Same | Same |
| Calories per serving | 170 Calories per 2/3 Cup Serving | 170 Calories per 2/3 Cup Serving |
| Nutrition Information on front of Package | Same | Same |
| Please select one for purchase | ○ | ○ |
| Don't Know | ○ | |

36.     Dr. Toubia also argues that I should have used an experimental design that randomly assigns respondents to either a test group (shown the actual Breyers product with the Vanilla Representations) or control group (shown the actual Breyers product without the Vanilla Representations). Accordingly, Dr. Toubia is opposed to my use of the direct survey questionnaire technique common to marketing and public opinion research to address the relevant issues in *Vizcarra*.[7]

---

[7] Directly asking respondents their understanding and opinions is a well-accepted and established methodology in marketing and survey research. *See* Bradburn, N. M., Sudman, S., & Wansink, B. 2004. Asking Questions: A Practical Guide to Questionnaire Design.

37.    According to Dr. Toubia, my consumer perceptions survey cannot isolate a potential effect of the Vanilla Representations without using a control group because respondents might have pre-existing beliefs or there could be other confounding factors (Toubia Report, ¶¶ 22-28).

38.    Again, I have routinely provided the courts reliable information conducting consumer surveys without a control group as specified by Dr. Toubia. Defendants' experts robotically exaggerate the potential error introduced by so-called "noise" in survey responses, while ignoring the introduction of error by using a test-control group design that does nothing to check the influence of irrelevant pre-existing beliefs, preferences, and brand loyalties (that consumers have for the branded products shown respondents as stimuli in test-control group experiments). In an irony not lost on this researcher, experts that use branded products in their test-control groups are guilty of the methodological sin of encouraging respondents to rely on their previously formed attitudes, opinions, and preferences about the branded products, blunting respondent's sensitivity to the presence or absence of the alleged misrepresentation(s) in the presented stimulus. As an illustration, these experts naively act on the premise that consumers shown a Ford commercial without the "Built Ford Tough" messaging in a control group stimulus will somehow not be affected by having been exposed thousands of times in the past to "Ford Tough" advertising.

39.    In my description of my past consumer surveys conducted in the context of litigation, I have cited more than a dozen litigations for which I have conducted consumer perceptions surveys, including my consumer survey conducted in *Vizcarra*. *None* of these used a control group as specified by Dr. Toubia. I have demonstrated in my expert reports that carefully constructed

---

San Francisco: Jossey-Bass. *See* Groves, Robert M., Floyd J. Fowler, Jr., Mick P. Couper, James M. Lepkowski, Eleanor Singer, and Roger Tourangeau. 2011. <u>Survey Methodology</u> (Second Edition). John Wiley & Sons. *See* Marsden, Peter V. and James D. Wright. 2010. <u>Handbook of Survey Research</u> (Second Edition). Emerald Group Publishing. *See* Tourangeau, R., Rips, L. J., & Rasinski, K. 2000. <u>The Psychology of Survey Response</u>. Cambridge University Press.

consumer surveys relying on direct measurement of consumer perceptions can yield reliable information useful to the courts.

40.    Most recently, in my trial testimony in *Fishon v. Premier Nutritionals* in May, 2022, I explained to the jury that the defendant's insistence of a control group is based on a misapplication of survey standards used in trademark infringement and Lanham Act litigation to survey practice for consumer perception surveys. As the *Reference Manual on Scientific Evidence* discusses, controls are often needed in business versus business disputes like trademark and Lanham Act cases because the factual question at issue is whether some specific element of advertising causes confusion between two competitor products or the competitor's false advertising causes consumers to choose one competitor product over another.[8] In Lanham Act cases that test such a causal proposition, it is not enough for a survey "simply to describe attitudes or beliefs or reported behaviors, but to determine the source of those attitudes or beliefs or behaviors."[9]

41.    But that is not my assignment here, nor is it a relevant issue in this litigation. With respect to my consumer perceptions survey, my assignment was to measure consumers' perceptions of the Vanilla Representations as displayed on the front label of the Product with respect to the Plaintiffs' theory of liability, not to dissect and identify the sources of information that resulted in consumers' perceiving the Vanilla Representations to convey that all vanilla flavor is sourced from vanilla extract. A survey in a consumer false advertising case need only measure the consumer's perceptions of the alleged misrepresentations, not to isolate the source of those perceptions. In contrast, a control group is recommended in the trademark and Lanham Act cases challenging the conduct of a competitor where a causal link is required to prove that another organization was harmed.[10] Therefore, my research objective does not necessitate the use of a

---

[8] Shari S. Diamond, "Reference Guide on Survey Research," p. 397.

[9] Ibid.

[10] *See FTC v. On Point Global LLC*, No. 19-25046-Civ-Scola, 2021 U.S. Dist. LEXIS 201532, at *28–29 (S.D. Fla. Sept. 22, 2021) ("The failure to use a control group was not necessary, as it is unclear what would be controlled. While the Defendants cite to case law concerning the use of control groups in trademark infringement cases, under Section 5(a) [of the FTC Act] courts look

control group in order to, for example, control for consumers pre-existing beliefs that an image of a vanilla bean conveys that the vanilla favor is sourced from vanilla extract.[11]

42.    Dr. Toubia also fails to note the steps that I took to reduce the potential for "confounding" factors, Toubia Report, ¶¶ 22, 28, such as "yea-saying bias," *id.*, n. 35, for the impact on data quality from respondents that are inattentive or guessing in answering my survey questions. My survey questionnaire included measures to identify such respondents and remove them from the survey before they were asked my substantive survey questions. For instance, respondents indicating that they had purchased a fictitious ice cream brand were not allowed to continue in the survey. Also, respondents unable to comprehend and self-report the topic of the survey were also not allowed to continue in the survey.

43.    I also took the active step to instruct the respondents to base their answers on the Product stimulus shown them in the survey so that my survey would provide a reliable, direct measurement of consumers' understanding of the product packaging. Prior to each consumer perceptions' question, I instructed the respondents to "**base your answers only on the product packaging that we have shown you.**"

44.    Dr. Toubia's accusations are without merit that my report "mischaracterizes the scientific evidence on contingent valuation that he cites justify his 'referendum' study design (Toubia Report, ¶ 48). Dr. Toubia presents no evidence that I mischaracterized anything.

45.    The referendum section of my survey is based on the well-established contingent valuation methodology (the main type of stated preference survey

---

to the 'net impression' created when determining whether a representation was likely to mislead."). *See* Shari Diamond's "Reference Guide on Survey Research," p. 397-398 for a discussion of control groups used in trademark infringement and Lanham Act cases.

[11] In a consumer false labelling case, the consumer survey's objective to measure a reasonable consumer's perception of the representations at issue. *See Korolshteyn v. Costco Wholesale Corp.*, No. 3:15-cv-709-CAB-RBB, 2017 WL 1020391, at *7 (S.D. Cal. Mar. 16, 2017) ("That class members may have learned about Ginkgo biloba or TruNature Ginkgo from other sources does not absolve Defendants from liability for false statements that appeared on the labels of the products purchased by the class members.")

methodology), in which the use of referendum questions is central. This is not an experimental, unvetted, or untested methodology. The approach was fully vetted in a U.S. government expert review entitled "The Report of the NOAA Panel on Contingent Valuation" (January 11, 1993), which is often called the "NOAA Blue-Ribbon Panel." The Blue-Ribbon Panel was headed by two economists previously awarded the Nobel Prize in Economic Sciences, Kenneth Arrow and Robert Solow. The referendum question format, which is a question format used in contingent valuation, was regarded by the panel as having many advantages for measuring respondents' valuations of non-market goods compared to open-ended questions and other formats.

46.     Dr. Toubia's conclusion that my report "mischaracterizes the scientific evidence" is based on his assertions as follows (which I rebut below):

- Dr. Kenneth Arrow and his co-author Robert Solow, who authored a key US Government NOAA Report on Contingent Valuation from which my referendum question format is derived, "specifically seeks to determine the value of a public good from people who do not directly use that good." Dr. Toubia states that the "NOAA approach differs from Dr. Dennis's survey objectives and survey execution" (Toubia Report, ¶ 49). With this critique, it is clear that Dr. Toubia is unaware that since the issuance of Arrow and Solow's *Report of the NOAA Panel on Contingent Valuation* was issued in 1993, contingent valuation has evolved into a mainstream methodology used for research involving both public and *private sector* goods. Contingent valuation is often used for a number of subject-matter domains, including health care topics[12] and not just for natural resource damage assessments. There are over 7,500 academic, government and private sector publications based on contingent valuation methodology.[13]

- Dr. Toubia also states that the "preferred approach in the NOAA

---

[12] *See* A. Diener, B. O'Brien, and A. Gafni. 1998. Health Care Contingent Valuation Studies:  A Review and Classification of the Literature. Health Economics, 7(4): 323-326.

[13] Carson, Richard. 2011. Contingent Valuation: A Comprehensive Bibliography and History. Northampton, MA. Edward Elgar.

report is to present the question as how much the respondent would be willing to pay to either avoid or clean up environmental damage" (Toubia Report, ¶ 49). Dr. Toubia fails to understand that the referendum question *precedes* the administration of the willingness-to-pay question in contingent valuation. The referendum question in my survey is in fact based on the contingent valuation approach. My materiality survey uses only *only* the referendum part of the contingent valuation approach, not the willingness-to-pay survey question(s).

## MY PROPOSED USE OF CONTINGENT VALUATION METHODOLOGY (CV) WILL PROVIDE A RELIABLE ESTIMATE OF ANY PRICE PREMIUM SOLELY ATTRIBUTABLE TO THE VANILLA REPRESENTATIONS

47.     Dr. Toubia also criticizes my proposed use of the contingent valuation methodology (CV) for measuring any price premium solely attributable to the Vanilla Representations. Dr. Toubia summarizes some of the methodological criticisms that have been made of CV (Toubia Report, ¶ 63). I have previously addressed those criticisms in my declarations filed in litigations where I used CV in my court-accepted price premium surveys (including *Ebin v. Kangadis Food Inc.*, *Sachs and Alden v. Toyota Motor Corporation, Avram v. Samsung Electronics America, Inc. and Lowe's Home Centers*, *IN RE: Scotts EZ Seed Litigation*, and *Dzielak v Whirlpool*).

48.     Dr. Toubia's criticisms CV are based on a literature that criticizes its use in environmental economics studies that attempt to measure the extent to which people value public goods such as clean air or the avoidance of environmental harms (such as oil spills). The use of CV in such valuation studies have been embroiled in politics because the methodology has been used repeatedly to calculate economic damages to be paid by the polluting party, as I explain further below.

49.     Because CV has been most prominently used by governmental agencies to develop valuations of natural resources to support regulations or calculate damages, the methodology has been targeted for criticism by well-resourced industries. Big industry criticism of CV dates back to the use of CV by

the US government as the tool for measuring economic damages from the 1989 Exxon *Valdez* Oil Spill in Prince William Sound.[14] In his report, Dr. Toubia recites the standard big industry criticisms of CV. None of these criticisms are new to me.

50.     Over the past twenty years, I have been in a position to witness firsthand the politics that infuse the criticism of CV. These criticisms are the same ones used by industry opponents of governmental regulation and environmental protections directed at big oil, coal, electric utility, and other companies.

51.     In his criticisms, Dr. Toubia overlooks the fact that more than 7,500 papers and studies have been based on CV, spanning 50 years and over 100 countries.[15] Critics tend to cite a few poorly conducted CV studies, while ignoring the more than thirty empirical studies showing that CV can be a reliable methodology.[16]

52.     Indeed, the criticisms that Dr. Toubia levies were addressed by the previously-noted NOAA Blue Ribbon Panel on Contingent Valuation, led by two Nobel Prize winners in economics. The NOAA Panel concluded that the criticisms can be avoided if the CV study is constructed properly. The NOAA Panel created a set of best practices which I have updated in my work (*IN RE: Scotts EZ Seed*, *Dzielak*, etc.) to incorporate the advantages of the internet mode of data collection (which became possible since the NOAA Report was published).[17] The NOAA

---

[14] *See* Richard Carson. 1997. Contingent Valuation Surveys and Tests of Insensitivity to Scope. In R.J. Kopp, W. Pommerhene, and N. Schwartz, eds., <u>Determining the Value of Non-Marketed Goods: Economic, Psychological, and Policy Relevant Aspects of Contingent Valuation Methods</u> Boston: Kluwer.

[15] Richard Carson. 2011. *Contingent Valuation:  A Comprehensive Bibliography and History*. Edward Elgar, Northampton, MA.

[16] These studies specifically address the "endowment effect" or "embeddedness" criticism made by Dr. Toubia (Toubia Report, n. 114) that respondents to a CV survey are inherently unresponsive to the characteristics of the good being valued (i.e., respondents are said to be insensitive to the scope of the good offered in the valuation exercise). *See* Carson (1997) in R.J. Kopp et al., in <u>Determining the Value of Non-Marketed Goods.</u>

[17] The National Oceanic and Atmospheric Administration (NOAA) Blue Ribbon Panel was headed by Kenneth Arrow and Robert Solow. *See* Kenneth Arrow et al., January 11, 1993, Report of the NOAA Panel on Contingent Valuation.

Panel study is generally regarded by researchers as an affirmation of the reliability of the CV approach. The NOAA Panel in its report and in its transmittal letter to NOAA's general counsel actually stated support for the CV approach.[18]

53.     Further, CV is closely allied in its origins with conventional choice-based conjoint methodology, which is also a reliable methodology accepted by researchers seeking to measure consumers' valuation of attributes of consumer products.[19] In short, contrary to criticisms made by CV by Dr. Toubia, CV is an established methodology, that, when implemented properly, will produce scientifically accepted results, as affirmed by the NOAA Report and thousands of published articles that continue to refine and improve the approach.

54.     Finally, I note that my use of CV is in the context of measuring any price premium associated with a non-hypothetical private good (vanilla ice cream) with which all my respondents will have had a personal connection through actual purchases. The topic of my survey will not be a hypothetical public good or avoidance of a public harm with which the respondents do not have a direct connection. Accordingly, criticisms of CV, which are based on the premise that measuring passive use valuation is inherently problematic, do not apply to my proposed approach.

55.     Dr. Toubia also claimed that my CV survey will not take into account supply-side factors (Toubia Report, ¶ 65).  This is not the case.  I will incorporate supply-side factors, as explained below.

56.     Dr. Toubia criticisms of my proposed price premium survey are essentially identical to those made by the defendants who criticized my conjoint survey in *Allen v. ConAgra Foods, Inc.*, and in *Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc*.  In *Allen*, like *McMorrow*, the defendants criticized my survey for supposedly not taking into account supply-side factors and instead measuring

---

[18] The report and transmittal included this statement:  "CV studies can produce estimates reliable enough to be the starting point for a judicial or administrative determination of natural resource damages-including passive use values."

[19] Carson, Richard and Mikołaj Czajkowski, 2014, The Discrete Choice Experiment Approach to Environmental Contingent Valuation.  Edward Elgar, Northampton, MA., pp. 7-8. http://econweb.ucsd.edu/~rcarson/papers/dceapproach.pdf

only consumers' subjective willingness to pay. In *Allen*, the court rejected this argument that my survey "analysis does not adequately consider supply-side factors, meaning that it measures consumers' willingness to pay rather than the price premium attributable to the claims" because the analysis relied on "actual quantities of Parkay Spray sold during the class period," used "actual, historical, market-clearing prices," and included a "no-buy option."

57.     The court also rejected the same criticism in *Fitzhenry*, admitting my testimony and ultimately certifying the class.  Similarly, Defendant also criticized my price premium survey in *McMorrow et al. v. Mondelez* for purportedly not incorporating supply-side factors but failed to convince the court to find my survey unreliable.

58.     My CV survey will be grounded in market reality:  the survey will take into account "supply-side" considerations by featuring the actual market price of the Defendant's Product based on actual market transactions.  Accordingly, my survey design will be based on the market reality of asking consumers' whether they would purchase the vanilla ice cream product at the actual market price with versus without the Vanilla Representations on the product package. There is no dispute that the actual transaction price to be featured in my CV survey incorporates supply-side considerations because the actual market transactions reflect the price at which the supplier was willing to sell the Product.

59.     In setting the price point for its Product, Defendant would have taken into account the supply-side considerations of its costs for research and development, manufacturing and distribution, advertising and marketing, and other costs, any profit goal, the competitive market of similar products being sold, government policies and regulations, etc.[20]  Consequently, the respondents in my CV survey will consider market-based choice scenarios reflecting supply-side considerations.  Moreover, by this means of featuring the market-based price in my CV survey, the survey addresses a secondary criticism that my survey is based on a "hypothetical" choice (Toubia Report, ¶ 63) when in fact the key features in the

---

[20] Supply-side factors are described in economics textbooks such as: Ayers & Collins, 2003, <u>Microeconomics</u>, Pearson; Melvin & Boyes, 2002, <u>Microeconomics</u>, 5th edition Houghton Mifflin; Samuelson & Nordhaus, 2001, <u>Microeconomics</u>, 17th edition McGraw-Hill.

products described to the respondents will be based on the actual market price and features of the Defendant's product.

## RESPONSE TO OTHER CRITICISMS DR. TOUBIA MADE OF MY SURVEYS

60.     *I established that I surveyed a representative sample of consumers.* Dr. Toubia complains that I provide no evidence that I reached a representative sample for my consumer surveys (Toubia Report, ¶¶ 51-52). Dr. Toubia ignores the fact that I made significant efforts to restrict my survey sample to only those consumers whose opinions would be relevant to the survey – that is, that narrow segment of Californian consumers who purchased Breyers vanilla-flavored ice cream in the past 12 months. A simple examination of my survey tables attached to my expert report shows that I obtained a representative sample from this segment. 58.1% and 62.0% of my respondents were female for the consumer perceptions and materiality surveys, respectively – typically, consumer surveys tend to have about 60% female representation. Also, the distribution of respondents by age was also typical of consumer surveys, with 53.2% and 56.9% of the respondents being under the age of 50 for the consumer perceptions and materiality surveys, respectively.

61.     Moreover, I also attached to my revised expert report the cross-tabulations demonstrating that the consumer perceptions and materiality survey results were not significantly different by gender, age, or educational obtainment. Therefore, even if my interviewed sample were not representative (but it was in fact), the results would not have changed significantly even if I had had different distributions of respondents by gender, age, or educational obtainment.

62.     *I properly pretested my survey questionnaire.* Dr. Toubia also complains that I did not adequately test my survey questions before collecting the survey data (Toubia Report, ¶¶ 53-55). This is not true. Dr. Toubia fails to mention that I had already conducted qualitative "cognitive" interviews for my initial consumer surveys for my June 11, 2021 expert report. I thoroughly tested those surveys using gold-standard testing procedures. There was not a need to conduct

another round of cognitive interviews for my revised surveys because the survey questions remained the same as before.

63.     *Response to remaining criticisms made by Dr. Toubia.* Other criticisms by Dr. Toubia are either wrong or misrepresent industry standards. First, it is not in fact the standard in survey research to always provide a "don't know" or "no opinion" response option for all the screening questions in a survey (Toubia Report, ¶ 57).[21] The survey research literature has established that providing such response options can lead to "satisficing" by respondents, resulting in respondents putting in insufficient cognitive effort in answering the survey questions. Survey research experts need to take into account the risk of satisficing and determine whether on balance the survey data will be more reliable with or without such non-attitude response options.

64.     Second, Dr. Toubia also criticizes me for not asking respondents about whether they have specialized knowledge about the at-issue product (such as the case of employees of the dairy or food science industries) and then screening any such respondents out of the survey (Toubia Report, ¶ 58). The likelihood that my survey sample would include <u>any</u> such respondents is extraordinarily remote. Based on my experience in conducting consumer surveys for the past twenty-five years I do not believe that this highly unlikely possibility justifies adding another survey question to the length of the survey.

---

[21] For evidence that providing a "no opinion" response option can reduce survey data quality, *see* Krosnick, Jon A., Allyson L. Holbrook, Matthew K. Berent, Richard T. Carson, W. Michael Hanemann, Raymond J. Kopp, Robert Cameron Mitchell, Stanley Presser, Paul A. Ruud, V. Kerry Smith, Wendy R. Moody, Melanie C. Green and Michael Conaway. 2002. The Impact of "No Opinion" Response Options on Data Quality: Non-Attitude Reduction or an Invitation to Satisfice?  Public Opinion Quarterly 66 (3): 371-403.

## **CONCLUSION**

65.     The Toubia Report has not undermined or otherwise affected my confidence in the reliability or validity of my consumer surveys or in the scientific rigor of my proposed price premium survey.

66.     I conclude that the reasonable consumer was misled by Defendant's labelling practices, as indicated by a substantial majority of my respondents understanding the Defendant's Vanilla Representations to convey meanings consistent with the Plaintiffs' allegations. A substantial majority of consumers in my survey perceived the Defendant's Vanilla Representations to communicate that all of the vanilla flavor was sourced from vanilla extract. Furthermore, my materiality survey established that this consumer perception was material to consumers' purchasing decisions. I have proposed an approach for measuring reliably any price premium solely attributable to the Vanilla Representations.

67.     The facts and data that I considered for developing the surveys and my opinions in this report are cited herein and in my two previous expert reports. I reserve the right to modify my opinions if I were to be provided additional information, and to supplement them, if necessary, to respond to criticisms or objections from the opposing party.

Executed in E. Palo Alto, California on June 16, 2022.


_____

J. MICHAEL DENNIS, PH. D

June 16, 2022
DATE

**List of Attachments**

A      Curriculum Vitae of J. Michael Dennis, Ph.D.

# J. MICHAEL DENNIS

Phone: (650) 288-1930                                                     274 Redwood Shores Parkway, #529
JMDSTAT@gmail.com                                                      Redwood City, CA 94065

Education

| | | | |
|---|---|---|---|
| University of Texas, Austin | Government | B.A. | 1984 |
| University of Texas, Austin | Government | M.A. | 1986 |
| University of Chicago | Political Science | Ph.D. | 1992 |

Employment

| | |
|---|---|
| 2015-Present | Senior Vice President, NORC |
| 2014-Present | President and Owner, JMDSTAT Consulting Inc. |
| 2012-2014 | Managing Director, GfK Custom Research LLC (GfK acquired Knowledge Networks in January 2012) |
| 2009-2011 | Executive Vice President, Knowledge Networks |
| 2007- 2008 | Senior Vice President, Knowledge Networks, Inc |
| 2001-2006 | Vice President and Managing Director, Knowledge Networks, Inc |
| 2000-2001 | Vice President of Operations and Survey Research, Knowledge Networks, Inc. |
| 1999-2000 | Senior Scientist, Abt Associates Inc. |
| 1998-1999 | Senior Survey Director, Abt Associates Inc. |
| 1992-1998 | Survey Director, Abt Associates Inc |
| 1989-1992 | Research Assistant, Political Science Department, University of Chicago |

Notable Past Projects

- 2020 Facebook Election Research Project, 2020-Present, NORC Director. Funded by Facebook Technologies, NORC's study director a national study examining the impact of social media on U.S. politics, democratic institutions, and elections.
- America in One Room (A1R), 2019, NORC Director. Funded by Helena Project and conducted under the supervision of Professors James Fishkin and Larry Diamond from the Center for Deliberative Democracy at Stanford University.
- Time-Sharing Experiments for the Social Sciences (TESS), 2016-2020, Co-Investigator, Funded by the National Science Foundation (Award No. 1628057).  NORC's study director for approximately 140 hundred social science experiments funded by the TESS program.
- Demonstration of a Feasibility of Improving Scientific Literacy and Lifelong Learning through a Just-in-Time Dissemination Process, 2016-Present, Co-Investigator, Funded by National Aeronautics and Space Administration (NASA), (Grant No. F041712).  NORC's director of the five-year survey project funded by NASA in collaboration with researchers from the Institute for Social Research, University of Michigan.
- GenForward Panel, 2016-Present.  NORC Director, funded by John D. & Catherine T. MacArthur Foundation.  NORC's study director for the University of Chicago polling panel of young adults in collaboration with the Black Youth Project and the Associated Press-NORC Center for Public Affairs Research.
- Connecting Health and Technology, 2013-2014, GfK Director, Funded by the American Legacy Foundation.  GfK's Study Director responsible for the survey design and management of a custom panel study of 10,000 U.S. teens and young adults measuring the effectiveness of the Legacy "Truth" smoking prevention media campaign.
- Google Screenwise Research Panel 2011-2014, Director.  Knowledge Networks' and later GfK's study director responsible for the design and implementation of a new custom panel of broadband households measuring how consumers use the internet.
- Time-Sharing Experiments for the Social Sciences (TESS), 2012-2016, Co-Investigator, Funded by the National Science Foundation (Award No. 1227179).  Knowledge Networks/GfK's study director for more than two hundred social science experiments funded by the TESS program.

- American National Elections Studies 2007-2009 Panel Study, Knowledge Networks Principal Investigator, Funded by the National Science Foundation.   The Knowledge Networks study director responsible for sampling, data collection methodology, and project management for a longitudinal study of approximately 2,500 households during the historic 2008 Presidential election.
- National Annenberg Election Survey 2007-2009, Knowledge Networks Director, Annenberg Public Policy Center, University of Pennsylvania.  The Knowledge Networks study director responsible for project management for large-scale tracking study (20K interviews per wave) of the U.S. electorate during the historic 2008 Presidential election.
- National Immunization Survey, Abt Associates Data Collection Director, 1997-2000, Funded by the U.S. Centers for Disease Control and Prevention.  Responsible for the data collection for the U.S. Federal government's largest random digit dialing telephone survey with approximately 1M households contacted each year.
- Project Network (First Followup), Abt Associates Project Director, Funded by the U.S. Social Security Administration.  Led the project management team for this in-person field study.
- Estimation of the Number of Hard Core Drug Users in the U.S., Office of National Drug Control Policy
- Access to Kidney Transplantation, Agency for Health Care Policy and Research.   Led the survey project management team for this in-person field study testing an experimental method for estimating hard core drug use.
- A Case Control Study of Stomach Cancer in Poland and Polish Americans, National Cancer Institute
- The Prevalence of Alcohol and Other Drug Abuse and Dependence in Short Term General Hospitals and the Impact of Abuse and Dependence on Hospital Utilization, Charges and Costs, National Institute of Alcohol Abuse and Alcoholism

Expert Witness in Litigation:  Testimony at Deposition or Trial in Last Four Years

1. June 22, 2018.  Expert Deposition. Theodore Broomfield, et al. v. Craft Brew Alliance, Inc., et al.  Case No. 5:17-cv-01027-BLF. United States District Court, Northern District of California, San Jose Division.
2. August 21, 2018. Expert Deposition. Anne De Lacour et al. v. Colgate-Palmolive Co., and Tom's of Maine Inc.  United States District Court, Southern District of New York. 16 Civ. 8364 (RA) (AJP).
3. September 5, 2018. Expert Deposition. Suzanna Bowling et al. v. Johnson & Johnson and McNeil Nutritionals, LLC.  U.S. District Court, Southern District of New York. Case No. 1:17-cv-03982.
4. September 10, 2018. Expert Deposition.  Dzielak et al. v. Whirlpool. U.S. District Court, District of New Jersey.  Civil Action No. 2:12-cv-00089-KM-JBC. .
5. October 26, 2018. Expert Deposition. Ryan Porter and Haarin Kwon v. NBTY, Inc., United States Nutrition, Inc., Healthwatchers (DE), Inc., et al. U.S. District Court, Northern District of Illinois. Civil Action No. 15-cv-11459.
6. October 30, 2018. Expert Deposition. Browning and Basile et al. v. Unilever United States, Inc. U.S. District Court, Central California. Case No. 8:16-CV-2210-AG-KES.
7. February 14, 2019.  Expert Deposition. Erin Allen et al. v. Conagra Foods Inc. U.S. District Court, Northern District of California. Case No. 3:13-CV-01279-VC.
8. June 21, 2019. Expert Deposition. Joseph Gregorio, et al. v The Clorox Company. U.S. District Court, Northern District of California. Case No. 4:17-cv-03824-PJH.
9. October 3, 2019. Expert Deposition. Patrick McMorrow et al. v. Mondelez International, Inc. U.S. District Court, Southern District of California. Case No. 3:17-cv-2327-BAS-JLB.
10. October 28, 2019. Expert Deposition. Deveroux v. Apple Inc. Superior Court of the State of California – County of Santa Clara. Case No. 1-14-CV-271773.
11. November 9, 2019. Expert Deposition. Buckeye Tree Lodge and Sequoia Village Inn, LLC, et al. v. Expedia, Inc. U.S. District Court, Northern District of California. Case No. 16:cv-04721-VC.
12. December 17, 2019. Expert Deposition. Camille Cabrera v. Bayer Healthcare LLC and Bayer Corp., U.S. District Court for the Central District of California (Case No. 2:17-cv-08525).
13. January 16, 2020. Expert Deposition. In Re: Santa Fe Natural Tobacco Company Marketing & Sales Practices and Products Liability Litigation. U.S. District Court for the District of New Mexico (Case No. 1:16-md-02695-JB-LF).
14. April 6, 2020.  Expert Deposition. Pardini v. Unilever. U.S. District Court for the Northern District of California (Case No. Case No. CV13-1675 SC).

15. May 27, 2020. Expert Deposition. Patrick McMorrow et al. v. Mondelez International, Inc. U.S. District Court, Southern District of California. Case No. 3:17-cv-2327-BAS-JLB.
16. December 30, 2020. Expert Deposition. Michael Maeda et al. v. Kennedy Endeavors, Inc. U.S. District Court, District of Hawaii. Case No. 1:18-CV-00459-JAO-WRP.
17. January 19, 2021. Expert Deposition. Shelly Benson et al. v. Newell Brands, Inc. and NUK USA LLC. U.S. District Court, Northern District of Illinois. Civil Action No. 19-cv-06836.
18. February 26, 2021. Expert Deposition. Sharon Willis et al. v. Colgate-Palmolive Co. U.S. District Court, Central District of California. Civil Action 2:19-CV-08542-JGB-RAO.
19. March 15, 2021. Expert Deposition. Sharpe et al. v. A & W Concentrate Company and Keurig Dr. Pepper Inc. (E.D.N.Y.) Civil Action No. 19-cv-00768 (BMC).
20. July 1, 2021. Expert Deposition. Sharpe et al. v. GT's Living Foods, LLC. U.S. District Court, Central District of California. Civil Action 2:19-CV-10920-FMO-GJS.
21. July 12, 2021. Expert Deposition. Vizcarra et al. v. Unilever United States, Inc. U.S. District Court for the Northern District of California (Case No. 4:20-cv-02777-YGR).
22. August 23, 2021. Expert Deposition. State of New Mexico v. Solvay Pharmaceuticals, Inc., Abbott Products, Inc., Abbott Laboratories, Abbvie Inc. State of New Mexico, County of Santa Fe (Case No. D-101-CV-2019-01897).
23. August 24, 2021. Expert Deposition. Minor et al. v. Baker Mills, Inc. and Kodiak Cakes, LLC. U.S. District Court for the Northern District of California (Case No. 20-cv-02901-RS).
24. September 20, 2021. Expert Deposition. Senne et al. v. Office of the Commissioner of Baseball, et al. U.S. District Court for the Northern District of California (Case No. 3:2014-cv-00608).
25. October 8, 2021. Expert Deposition. Fishon et al. v. Peloton Interactive, Inc. United States District Court, Southern District of New York (Case No. 1:19-CV-11711-LJL).
26. October 25, 2021. Expert Deposition. IN RE KIND LLC "Healthy and All Natural" Litigation. United States District Court, Southern District of New York (15-MD-2645 (WHP)).
27. October 26, 2021. Expert Deposition. IN RE: FCA US LLC Monostable Electronic Gearshift Litigation. United States District Court, Eastern District of Michigan Southern Division (Case No. 16-md-02744).
28. November 4, 2021. Expert Deposition.  IN RE: FISHER-PRICE ROCK 'N PLAY SLEEPER MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION, United States District Court, Western District of New York (Case No. 1:19-md-2903).
29. November 29, 2021. Expert Deposition. Sharpe et al. v. A & W Concentrate Company and Keurig Dr. Pepper Inc. (E.D.N.Y.) Civil Action No. 19-cv-00768 (BMC).
30. March 10, 2022. Expert Deposition. Fishon et al. v. Premier Nutrition Corp. U.S. District for the Northern District of California, San Francisco Division (Case No. 3:16-CV-06980 RS).
31. March 24, 2022. Expert Deposition. Testone et al. v. Barlean's Organic Oils, LLC. U.S. District for the Southern District of California, Case No: 19-cv-0169-JLS-BGS.
32. May 27, 2022. Trial Testimony. Fishon et al. v. Premier Nutrition Corp. U.S. District for the Northern District of California, San Francisco Division (Case No. 3:16-CV-06980 RS).


Dissertation

"The Politics of Kidney Transplantation," Department of Political Science, University of Chicago, June 1992.  Chair:  Professor Jon Elster.  Published at https://sites.google.com/site/jmichaeldennis/home.


Publications

Michaels, Stuart, Vicki Pineau, Becky Reimer, Nadarajasundaram Ganesh, and J. Michael Dennis. 2019. Test of a Hybrid Method of Sampling the LGBT Population: Web Respondent Driven Sampling with Seeds from a Probability Sample. Journal of Official Statistics 35(4):731-752.

Cantrell J, Hair E. C., Smith, A., Bennett M., Rath, J.M., Thomas, R.K., Fahimi, M., Dennis, J.M., and Vallone, D. 2018.  Recruiting and Retaining Youth and Young Adults: Challenges and Opportunities in Survey Research for Tobacco Control. Tobacco Control 27(2).

Josh Pasek, S. Mo Jang, Curtiss L. Cobb III, J. Michael Dennis, and Charles DiSogra. 2015.  Can Marketing Data Aid Survey Research? Examining Accuracy and Completeness in Consumer-File Data. Public Opinion Quarterly.  78 (4): 889-916.

Baker, Reginald, Stephen J. Blumberg, J. Michael Brick, et al. 2010. AAPOR Report on Online Panels. Public Opinion Quarterly 74(4):711-781.

Sanders, Alan R., Douglas F. Levinson, Jubao Duan, et al. 2010. The Internet-based MGS2 Control Sample: Self Report of Mental Illness. American Journal of Psychiatry 167(7) 854-865.

Timothy Heeren, Erika M. Edwards, J. Michael Dennis, Sergei Rodkin, Ralph W. Hingson, and David L. Rosenbloom.  2008. "A Comparison of Results from an Alcohol Survey of a Pre-recruited Internet Panel and The National Epidemiological Survey on Alcohol and Related Conditions."  Alcoholism: Clinical and Experimental Research  32(2): 1-8.

J. Michael Dennis and Rick Li.  2007.  More Honest Answers to Surveys? A Study of Data Collection Mode Effects. Journal of Online Research 10(7):1-15.

Tom W. Smith and J. Michael Dennis. 2005. "Online versus In-Person: Experiments with Mode, Format, and Question Wordings." Public Opinion Pros, December.  Available at www.publicopinionpros.com/from_field/2005/dec/smithkn.asp.

Etzel Cardeña, J. Michael Dennis, Mark Winkel, and Linda J. Skitka. 2005. "A Snapshot of Terror: Acute Posttraumatic Responses to the September 11 Attack."  Journal of Post-Traumatic Stress 6(2):69-84.

William E. Schlenger, Juesta M. Caddell, Lori Ebert, B. Kathleen Jordan, Kathryn M. Rourke, David Wilson, Lisa Thalji, J. Michael Dennis, John A. Fairbank,  Richard A. Kulka. 2002.  "Psychological Reactions to Terrorist Attacks:  Findings from the National Study of Americans' Reactions to September 11."  Journal of the American Medical Association, 288(5): 1235-1244.

J. Michael Dennis. 2001. "Are Internet Panels Creating Professional Respondents?"  Marketing Research Summer: 484-488.

J. Michael Dennis, Martin Frankel, Nancy A. Mathiowetz, Candice Saulsberry, Philip J. Smith, K.P. Srinath, Ann-Sofi Rodén, and Robert A. Wright. 1999. "Analysis of RDD Interviews by the Number of Call Attempts: The National Immunization Survey."  Proceedings of the Section on Survey Research Methods, American Statistical Association.

J. Michael Dennis, Victor G. Coronado, Martin Frankel, Ann-Sofi Rodén, Candice Saulsberry, Howard Speizer, and Robert A. Wright. 1998. "The Use of an Intranet to Manage a Telephone Survey." Proceedings of the Section on Survey Research Methods, American Statistical Association.

Paul Buckley, J. Michael Dennis, Candice Saulsberry, Victor G. Coronado, Trena Ezzati-Rice, Edmond Maes, Ann-Sofi Rodén, and Robert A. Wright. 1998. "Managing 78 Simultaneous RDD Samples."  Proceedings of the Section on Survey Research Methods, American Statistical Association.

Alan J. White, Ronald J. Ozminkowski, Andrea Hassol, J. Michael Dennis, and Michael Murphy. "The Effects of New York State's Ban on Multiple Listing for Cadaveric Kidney Transplantation." Health Services Research 33 (June, 1998).

Alan J. White, Ronald J. Ozminkowski, Andrea Hassol, J. Michael Dennis, and Michael Murphy. "The Relationship Between Multiple Listing and Cadaveric Kidney Transplantation and the Effects of a Multiple Listing Ban." Transplantation Reviews, II (April 1997): 76-84.

J. Michael Dennis, Ph.D. "Scarce Medical Resources: Hemodialysis and Kidney Transplantation," in Jon Elster, ed., Local Justice in America, New York, NY: Russell Sage Foundation, 1995.

J. Michael Dennis, Patricia Hanson, Ernest E. Hodge, Ruud A.F. Krom, Robert M. Veatch, "An Evaluation of the Ethics of Presumed Consent and a Proposal Based on Required Response," UNOS Update 10 (February, 1994): 10-15-18.

J. Michael Dennis.  "Surgeons Under Surveillance:  Dialysis and Transplantation in the U.S.," in Jon Elster and Nicolas Herpin, eds., The Ethics of Medical Choice, London:  Pinter, 1994.

J. Michael Dennis.  "The Colour of Genes in the U.S.," in Jon Elster and Nicolas Herpin, eds., The Ethics of Medical Choice, London:  Pinter, 1994.

J. Michael Dennis.  "Three Countries, Three Systems," in Jon Elster and Nicolas Herpin, eds., The Ethics of Medical Choice, London:  Pinter, 1994.

Michael P. Battaglia, Mary Cay Burich, J. Michael Dennis, Marcia Russell, Hal Yahoo, Page Chapel, "The Prevalence of Alcohol and Other Drug Abuse and Dependence in Short-Term General Hospitals," 1993 Proceedings of the International Conference on Establishment Surveys, American Statistical Association (1993): 569-572.

J. Michael Dennis. "Government Regulations 'Politicizing' Transplantation," Nephrology News & Issues 6 (September 1992): 48.

J. Michael Dennis. "A Review of Centralized-Rule Making in American Transplantation," Transplantation Reviews 6 (April 1992): 130-137.

Selected Papers

Dennis, J. Michael, John Dombrowski, Kathleen Hall Jamieson, Josh Pasek and Kenneth Winneg. Disentangling Mode Effects and Mode Differences in Recruitment: Randomizing Survey Mode at the Margins and Testing Discontinuities. Presented at the 2019 Annual Meeting of the American Association for Public Opinion Research.

Bilgen, Ipek, J. Michael Dennis, Nada Ganesh, Edward Mulrow, Vicki Pineau, Mark Watts and Michael Yang. Estimation Methods for Combining Probability and Nonprobability Samples. Presented at the 2019 Annual Meeting of the American Association for Public Opinion Research.

Dennis, J. Michael, Stephanie Jwo, Rosalind Koff, Stuart Michaels, Vicki Pineau and Becky Reimer. Comparing Two RDS Approaches to Extend the Reach of a Probability-Based Panel. Presented at the 2019 Annual Meeting of the American Association for Public Opinion Research..

J. Michael Dennis.  Panel-based Probability Alternatives for Sampling Racial and Ethnic Minorities. Presented at the 2018 Annual Meeting of the American Association for Public Opinion Research.

Ipek Bilgen, J. Michael Dennis, and Nada Ganesh. Examination of Nonresponse Follow-up (NRFU) Impact on AmeriSpeak Panel Data Quality and Study Estimates. Presented at the 2018 Annual Meeting of the American Association for Public Opinion Research.

David Sterrett, Dan Malato, Jennifer Benz, Ipek Bilgen, J. Michael Dennis, and Vicki Pineau. Exploring the Methodological Tradeoffs of Mixed-Mode Surveys with an Experimental Design.   Presented at the 2018 Annual Meeting of the American Association for Public Opinion Research.

Ipek Bilgen, J. Michael Dennis, and Tom Smith.  Comparing the Probability-Based AmeriSpeak Panel and the In-Person 2016 General Social Survey: Mode, Device, Item Wording Experiments. Presented at the 2018 Annual Meeting of the American Association for Public Opinion Research.

5

Nadarajasundaram Ganesh, Vicki Pineau, J. Michael Dennis. 2017. Managing Respondent Burden for a Household Panel using Permanent Random Number Sampling.  Presented at the 2017 Annual Meeting of the American Association for Public Opinion Research.

Pineau, Vicki, J. Michael Dennis, Stuart Michaels, Sherry Emery, Nadarajasundaram Ganesh. 2017. Surveying Rare or Hidden Populations Using a Probability-based Household Panel. Presented at the 2017 Annual Meeting of the American Association for Public Opinion Research.

Pineau, Vicki, Paul J. Lavrakas, and J. Michael Dennis.  2017.  Deploying a Total Survey Error (TSE) and Total Survey Quality (TSQ) Assessment of the AmeriSpeak® Panel.  Presented at the 2017 Annual Meeting of the American Association for Public Opinion Research.

Reimer, Becky, Jennifer Benz, Trevor Tompson, Liz Kantor, Rosalind Koff, J. Michael Dennis, Emily Swanson, David Pace, 2017. Testing A New Methodology for Exit Polling: A National, Panel-based Experiment. Presented at the 2017 Annual Meeting of the American Association for Public Opinion Research.

Malato, Dan, Jennifer Benz, Trevor Tompson, J. Michael Dennis, Vicki Pineau, Nadarajasundaram Ganesh.  2017. Impact of Mixed-Mode Recruitment and Data Collection on Sample Representativeness and Survey Estimates for a Probability-based Household Panel.  Presented at the 2017 Annual Meeting of the American Association for Public Opinion Research.

Barron, Martin and J. Michael Dennis. 2016. Multi-Client Household Panel Quality:  The Case of AmeriSpeak." Presented at the 2016 Annual Meeting of the American Association for Public Opinion Research.

Ganesh, N., J. Michel Dennis, and Paul J. Lavrakas. 2016.  Using Nonresponse Follow-up Recruitment to Help Build a Probability-based Research Panel.  Presented at the 2016 Annual Meeting of the American Association for Public Opinion Research.

Dennis, J. Michael, Angela Fontes, Kean Chew, Paul J. Lavrakas, Nada Ganesh. 2015. "Boosting Probability-Based Web Survey Response Rates via Nonresponse Follow-Up." Presented at the 2015 Annual Meeting of the American Association for Public Opinion Research.

Dennis, J. Michael, Kathleen Connolley, and Stephanie Jwo.  "Online Survey Sampling Solutions for Studies of LGB."  Presented at the 2013 Chicago Annual Workshop on Biomeasures Collection in Population-Based Health and Aging Research hosted by the Chicago Core on Biomeasures in Population-Based Health and Aging Research (CCBAR), October 17, 2013.

Dennis, J. Michael, Curtiss Cobb III.  "How Far Have We Come? The Lingering Digital Divide and Its Impact on the Representativeness of Internet Surveys."  Presented at the 2013 Annual Meeting of the American Association for Public Opinion Research.

Dennis, J. Michael, Curtiss Cobb III, Michael Lawrence, and Jordon Peugh. "The Prevalence and Impact of Self-Selection Bias and Panel Conditioning on Smoker Studies Using Established Internet Panels." Presented at the 2013 Annual Meeting of the American Association for Public Opinion Research.

Pasek, Josh, J. Michael Dennis, and Curtiss Cobb III. "Consumer File Ancillary Data and Nonresponse Adjustment: Assessing the Consistency of Estimates Across Weighting Strategies."  Presented at the 2013 Annual Meeting of the American Association for Public Opinion Research.  Submitted for publication.

Pasek, Josh. Seung Mo Jang, Curtiss Cobb, Charles DiSogra and J. Michael Dennis. "Can Microtargeting Improve Survey Sampling?  An Assessment of Accuracy and Bias in Consumer File Marketing Data." Presented at the 2012 Annual Meeting of the American Political Science Association.

Disogra, Charles. J. Michael Dennis and Mansour Fahimi. 2012 "Using Ancillary Information in National ABS Samples to Recruit Hard-to-Reach Young Adults and Hispanics." Presented at the 2012 Hard to Reach Conference sponsored by the American Statistical Association.

Lavrakas, Paul J. J. Michael Dennis, Jordan Peugh, Jeffrey Shand-Lubbers, Elissa Lee, Owen Charlebois and Mike Murakami. 2012 "An Experimental Investigation of the Effects of Noncontingent and Contingent Incentives in Recruiting a Long-Term Panel: Testing a Leverage Salience Theory Hypothesis." Presented at the 2012 Midwest Association for Public Opinion Research.

Pasek, Josh. Seung Mo Jang, Curtiss Cobb, Charles DiSogra and J. Michael Dennis. 2012  "How Accurate is Micro-Targeting? An Assessment of Marketing Data Bias for Political and Survey Purposes." Presented at the 2012Annual Conference of the American Association for Public Opinion Research and the 2012 Annual Conference of the American Political Science Association.

Dennis, J. Michael. Charles DiSogra and Erlina Hendarwan. 2012. "Using Ancillary Information to Stratify and Target Young Adults and Hispanics in National ABS Samples." Presented at the 2012 Annual Conference of the American Association for Public Opinion Research and the 2012 Hard to Reach Conference.

Pasek, Josh. S. Mo Jang, Curtiss Cobb, Charles DiSogra and J. Michael Dennis. 2012. "The Public According to Marketers: Imputing National Demographics From Marketing Data Linked to Address-Based Samples." Presented at the 2012 Annual Conference of the American Association for Public Opinion Research.

Shand-Lubbers, Jeff. J. Michael Dennis, Jordon Peugh, Liz Brisson and Zabe Bent. 2012 "The Use of Online Methodology to Inform Public Policy Planning: A Case Study from San Francisco." Presented at the 2012 Annual Conference of the American Association for Public Opinion Research.

Lavrakas, Paul. J. Michael Dennis, Jordon Peugh, Jeff Shand-Lubbers, Elissa Lee and Owen Charlebois. 2012. "Investigating Non-response Bias in a Non-response Bias Study." Presented at the 2012 Annual Conference of the American Association for Public Opinion Research.

Lavrakas, Paul. J. Michael Dennis, Jordon Peugh, Jeff Shand-Lubbers, Elissa Lee and Owen Charlebois. 2012. "Experimenting with Non-contingent and Contingent Incentives in a Media Measurement Panel." Presented at the 2012 Annual Conference of the American Association for Public Opinion Research.

DiSogra, Charles. Curtiss Cobb, Elisa Chan, and J. Michael Dennis. 2012 "Using Probability-Based Online Samples to Calibrate Non-Probability Opt-in Samples." Presented at the 2012 Annual Conference of the American Association for Public Opinion Research.

Dennis, J. Michael. Yelena Kruse, and Trevor Tompson. 2011. "Examination of Panel Conditioning Effects in a Web-Based 2007-2008 Election Study." Presented at the 2011 Annual Conference of the American Association for Public Opinion Research.

Zukin, Cliff, Jessica Godofsky, Carl Van Horn, Wendy Mansfield, and J. M. Dennis. 2011. "Can a Non-Probability Sample Ever be Useful for Representing a Population? Comparing Probability and Non-Probability Samples of Recent College Graduates."  Presented at the 2011 Annual Conference of the American Association for Public Opinion Research. Available at http://www.knowledgenetworks.com/ganp/docs/aapor2011/aapor11-can-a-non-probability-sample.pdf

Baker, Reg. Stephen Blumberg, J. Michael Brick, Mick P. Couper, Melanie Courtright, J. Michael Dennis, Don Dillman, Martin R. Frankel, Philip Garland, Robert M. Groves, Courtney Kenned, Jon Krosnick, Sunghee Lee, Paul J. Lavrakas, Michael Link, Linda Piekarski, Kumar Rao, Douglas Rivers, Randall K. Thomas, and Dan Zahs. 2010 "AAPOR Report on Online Panels." The Final Report of the AAPOR Online Panel Task Force.  Prepared for the American Association for Public Opinion Research,  March, 2010.

Dennis, J. Michael, "Using Ancillary Data Available for Address-Based Sampling to Measure Self-Selection Bias" Paper presented to the International Workshop on Using Multi-level Data from Sample Frames, Auxiliary Databases, Paradata and Related Sources to Detect and Adjust for Nonresponse Bias in Surveys, Chicago, June, 2011.

7

Dennis, J. Michael, Jordon Peugh, and Pat Graham. 2010. "KnowledgePanel Calibration: Using KnowledgePanel to Improve the Sample Representativeness and Accuracy of Opt-in Panel Data." Available at http://www.knowledgenetworks.com/ganp docs/KN-Calibration-Research-Note-2010-03-02.pdf

Dennis, J. Michael. 2010. "KnowledgePanel®: Processes & Procedures Contributing to Sample Representativeness & Tests for Self-Selection Bias."  Available at http://www.knowledgenetworks.com/ganp/reviewer-info.html.

Dennis, J. Michael, and Charles A. DiSogra. 2010. "Does Providing Internet Access to Non-Internet Households Affect Reported Media Behavior for Latinos and Non-Latinos?  Results from a Six-Month Longitudinal Survey." Presented at the 2010 Annual Conference of the American Association for Public Opinion Research. Available at http://www.knowledgenetworks.com/ganp/reviewer-info.html.

DiSogra, Charles, J. Michael Dennis, and Mansour Fahimi. 2010. "On the Quality of Ancillary Data Available for Address-Based Sampling." Presented at the 2010 Joint Statistical Meetings, Vancouver.  Available at http://www.knowledgenetworks.com/ganp/reviewer-info.html.

Kruse, Yelena, Erlina Hendarwan, J. Michael Dennis, and Charles A. DiSogra. 2010. "Analysis of Late Responders to Probability-based Web Panel Recruitment and Panel Surveys." Presented at the 2010 Annual Conference of the American Association for Public Opinion Research. Available at http://www.knowledgenetworks.com/ganp/reviewer-info.html.

Garrett, Joe, J. Michael Dennis, and Charles A. DiSogra. 2010. "Non-response Bias: Recent Findings from Address-based Panel Recruitment." Presented at the 2010 Annual Conference of the American Association for Public Opinion Research.  Available at http://www.knowledgenetworks.com/ganp/reviewer-info.html.

Dennis, J. Michael, Larry Osborn, and Karen Semans. March 2009. "Comparison Study of Early Adopter Attitudes and Online Behavior in Probability and Non-Probability Web Panels."  Available at http://www.knowledgenetworks.com/ganp/reviewer-info.html.

Dennis, J. Michael. 2009. "Description of Within-Panel Survey Sampling Methodology: The Knowledge Networks Approach."  Available at http://www.knowledgenetworks.com/ganp/docs/KN-Within-Panel-Survey-Sampling-Methodology.pdf.

Dennis, J. Michael, Trevor Tompson, Mike Henderson, and Yelena Kruse. 2009. "Measures of Non-Traditional Media Consumption During the 2008 Presidential Campaign."  Presented at the 2009 Annual Meeting of Midwest AAPOR, November 21, 2009.

Dennis, J. Michael, and Trevor Tompson. 2009. "Web Panel Studies of the 2008 Election: New Opportunities for Causal Analysis of Dynamic Change in the Electorate." Presented at the 2009 Annual Conference of the American Association for Public Opinion Research.  Available at http://www.knowledgenetworks.com/ganp/reviewer-info.html.

Kruse, Yelena, Mario Callegaro, J. Michael Dennis, Stefan Subias, Mike Lawrence, Charles DiSogra, and Trevor Tompson. 2009. "Panel Conditioning and Attrition in the AP-Yahoo! News Election Panel Study." Presented at the 2009 Annual Conference of the American Association for Public Opinion Research. Available at http://www.knowledgenetworks.com/ganp/reviewer-info.html.

J. Michael Dennis, Rick Li and Joe Hadfield. 2007. "Results of a Within-Panel Survey Experiment of Data Collection Mode Effects Using the General Social Survey's National Priority Battery." Presented at the 2007 Annual Conference of the American Association for Public Opinion Research.

J. Michael Dennis and Rick Li. 2005. "Results from a Knowledge Networks' Question Wording Experiment for Political Party Identification." Available at http://www.knowledgenetworks.com/ganp/docs/kn-party-id-experiment-022805.pdf

J. Michael Dennis, Cindy Chatt, Rick Li, Alicia Motta-Stanko, Paul Pulliam. 2005. "Data Collection Mode Effects Controlling for Sample Origins in a Panel Survey: Telephone versus Internet." Available at http://www.knowledgenetworks.com/ganp/rtimode.html.

J. Michael Dennis and Rick Li. 2004. "Health Condition Prevalence Rates Between National Health Interview Survey (NHIS) and Knowledge Networks (KN)." Available at http://www.knowledgenetworks.com/ganp/docs/KNvsNHIS2.pdf

J. Michael Dennis and Rick Li. 2004. "Weighting Procedures Used for the Veterans Administration Prescription Medication Study." Available at http://www.knowledgenetworks.com/ganp/docs/061604_Weighting-Description.pdf.

J.Michael Dennis, Rick Li, and Cindy Chatt, 2004. "Benchmarking Knowledge Networks' Web-Enabled Panel Survey of Selected GSS Questions Against GSS In-Person Interviews." Knowledge Networks Report, February 2004. Available at http://www.knowledgenetworks.com/ganp/docs/GSS02-DK-Rates-on-KN-Panel-v3.pdf

Vicky Pineau and J. Michael Dennis. 2004. "Methodology for Probability-Based Recruitment for a Web-Enabled Panel." Knowledge Networks Report

J. Michael Dennis. 2003. "Panel Attrition Impact: A Comparison of Responses to Attitudinal and Knowledge Questions about HIV Between Follow-up and Cross-Sectional Samples." Available at http://www.knowledgenetworks.com/ganp/docs/HIV-Study-Panel-Attrition-Impact-Research-Note-2003.pdf

J. Michael Dennis, Rick Li, J.R. DeShazo and Trudy Ann Cameron. 2003. "Correcting for Sample Bias in Internet Panel Surveys based on RDD Sampling." Presented at the Joint Statistical Meetings, August 2003

Dennis, J. Michael, Rick Li. 2003. "Effects of Panel Attrition on Survey Estimates." Presented at the 2003 Annual Conference for the American Association for Public Opinion Research.

Selected Workshops, Expert Panels, and Seminars

Workshop Participant. Mapping the Global Online Probability based Panel Landscape. RISCAPE Workshop. Amsterdam, Netherlands.  December 11-12, 2019.

Member, Expert Panel.  New Direction for the National Household Travel Survey. Sponsored by the Federal Highway Administration. 2018-Present.

Featured Speaker.  AARP "Think In" on Surveys of Asian Americans and Pacific Islanders.  July 23-24, 2018. Washington, DC.

Expert Panel Participant, National Survey of Family Growth, U.S. Centers for Disease Control and Prevention, April 30, 2018 – May 1, 2018.

Panel Participant and Featured Speaker.  "Workshop:  Harnessing Technology to
Reduce Attrition in Panel Surveys." Inter-American Development Bank.  Washington DC, October 2, 2017.

Featured Speaker.  Briefing Congress on the Legal Services Corporation New Report on *The Justice Gap: Measuring the Unmet Civil Legal Needs of Low-Income Americans.*  Russell Senate Building, Washington DC, June 14, 2017.

Panel Participant in an Invited Panel Session entitled "Better, Faster, Smarter – Maintaining Research Quality in a World of Intense Budget Pressure."  Annual Meeting of the Southern Association for Public Opinion.  October 10, 2013.

 "The NCRM Network of Methodological Innovation Web surveys for the general population: How, why and when?"  Workshop hosted by the University of Essex, Colchester, UK.  Presented the paper "Recommendations for Establishing a National Online Panel in the UK."  June 6-7, 2013.

"The Data Collection of the Future Has Already Started."  Seminar hosted by Willem Saris, RECSM, Universitat Pompeu Fabra in Barcelona.  Presented the paper  "Best Practices for Population-Based Online Surveys: Review of U.S. Methods Research."  July 2011.

"An International Workshop on Using Multi-level Data from Sample Frames, Auxiliary Databases, Paradata and Related Sources to Detect and Adjust for Nonresponse Bias in Surveys."  Sponsored by the National Science Foundation and hosted by NORC in Chicago.  June 2011.

"Innovative Survey Methods Workshop." Sponsored by the U.S. Department of Homeland Security and the Institute for Homeland Security Solutions.  December 2009.

"Sample Representativeness:  Implications for Administering and Testing Stated Preference Surveys."  Sponsored by EPA Cooperative Agreement CR83299-01 with the National Center for Environmental Economics, U.S. Environmental Protection Agency.  Hosted by the Resources for the Future. October 2, 2006.

"Recurring Surveys: Issues and Opportunities." Sponsored by the National Science Foundation. March 28-29, 2003.

Selected Guest Lecturer Assignments

George Washington University, University of California, Irvine, University of California, Berkeley, University of Michigan, University of Maryland, University of Pennsylvania, University of Southern California (USC), University of Texas, Austin, Stanford University.

Educational Honors
Century Fellowship, University of Chicago (1985-1988)
Phi Beta Kappa, University of Texas (1984-1985)
Honors in Government, University of Texas (1984)
Chapter President, Pi Sigma Alpha, University of Texas (1983-1984)
William Jennings Bryan Essay Winner, College of Liberal Arts, University of Texas (1983 and 1984)


Affiliations

American Association for Public Opinion Research (1992-), American Statistical Association, Member, AAPOR Online Task Force Report (2009-2010),  Chairman, Presumed Consent Subcommittee, Ethics Committee, UNOS (1992-1995), Member of Ethics Committee, the United Network for Organ Sharing (1992-1995), Member of Region 7, the United Network for Organ Sharing (1992-1995), American Political Science Association (1985-1994)